UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

            Plaintiff,

     v.

ROBERT MANNING, and JAMARE COATS,

         Defendants.

No.  CR 19-00313 WHA

**ORDER RE DEFENDANTS' MOTION FOR ACQUITTAL**

## INTRODUCTION

In this two co-defendant VICAR murder case, defendants move for acquittal under Federal Rule of Criminal Procedure 29, on the basis that there was insufficient evidence to prove, *inter alia*, mutual combat, malice aforethought, and enterprise purpose.  For the following reasons, the motions are **Denied**.

## STATEMENT

After a two-week trial, a jury convicted defendants Robert Manning and Jamare Coats of Murder in Aid of Racketeering in violation of 18 U.S.C. §1959 and Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. § 922(g).  In short, the background of the case is as follows:

On March 23, 2019, in the Fillmore district of San Francisco, a repast was underway in honor of a civic leader at the Fillmore Heritage Center.  Inside the center, the victim in this case, Misterdee Simmons, got into a verbal argument with a member of the Mac Block gang, whose territory included at least part of the Fillmore district.  Others gathered around the argument. Misterdee Simmons pulled a gun out of his waistline and said "You bitch-ass niggas better stop

playing with me, before I air it out."  This provoked a run by defendants and others, all members or associates of Mac Block.  Video footage from security cameras documented the run for guns by defendants Jamare Coats, Robert Manning, and Sean Harrison.  Manning and Harrison ran to Manning's vehicle parked at the McDonald's parking lot across the street.  As they were running, Manning stated "Fuck that, that dude whipped out on me."  Manning then opened his car door and sat in the vehicle with Harrison.  Testimony from Harrison described that inside the car, Manning flipped up the floormat to reveal two semi-automatic pistols.  Without exchanging words, Manning grabbed one two-tone Glock 23, and Harrison took the other gun, an all-black Glock 23.  The pair exited the vehicle together, walking back toward the Heritage Center.  Jamare Coats also ran to his own vehicle, armed himself, and moved his car closer to the Heritage Center.  After parking, Coats caught up with Manning and Harrison.  Within minutes, all three returned to the sidewalk outside the Fillmore Heritage Center where Misterdee Simmons waited with his gun in hand, pointed downward.  Several Street Violence Interruption Prevention ("SVIP") workers attempted to push back the defendants, but they continued toward Simmons.  Misterdee Simmons then fired his gun at Sean Harrison who was struck in the foot.  Sean Harrison fired back eleven times.  Misterdee Simmons fell to the ground and continued firing, whereupon defendant Coats fired six times from within the cover of an alcove next to the Fillmore Heritage Center.  Misterdee Simmons was struck by eleven bullets and died at the scene from loss of blood.  Bullets also wounded four bystanders, one of whom will be paralyzed for life.  Defendant Manning did not fire his gun.

Sean Harrison pled guilty and turned state's evidence, testifying at trial in an effort to obtain leniency.  The jury convicted defendant Coats of VICAR murder.  Although defendant Manning fired no weapon, the jury convicted him of VICAR murder on an aiding and abetting theory that he supplied a murder weapon to Sean Harrison.  A principal defense argument at trial was that Harrison and Coats had acted in self-defense.  All agree that Misterdee Simmons fired first.  Under California law, however, self-defense does not apply in cases of mutual combat.

2

**ANALYSIS**

Rule 29 provides the avenue by which defendants may move for acquittal. Under Rule 29, "[t]he evidence is sufficient to support a conviction if, reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vgeri*, 51 F. 3d 876, 879 (9th Cir. 1995) (cleaned up). On the other hand, the "evidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case. *United States v. Nevils*, 598 F. 3d 1158, 1167 (9th Cir. 2010).

Defendants argue numerous elements of the charged crimes were insufficiently proven by the government to support a conviction from a reasonable jury. Most notably, they challenge the government's theory of mutual combat (which would destroy any claim to self-defense), malice aforethought, and enterprise purpose.

**1. MUTUAL COMBAT.**

*First,* both defendants argue that there was insufficient evidence to justify a finding of mutual combat on the facts of our case. Contrary to defendants, there was adequate evidence to support a finding by the jury that an implied agreement for mutual combat existed, and therefore self-defense did not apply. Regarding mutual combat, we instructed the jury (paragraph 34):

> There is a limitation on self-defense and imperfect self-defense and this limitation arises in what is called "mutual combat." A fight is mutual combat when it begins or continues by mutual consent or agreement. That agreement may be expressly stated or implied. Someone who engages in mutual combat or who starts a fight has a right to self-defense ONLY IF: First, he actually and in good faith tried to stop fighting before killing in self-defense, Second, he indicated by word or by conduct to his opponent in a way that a reasonable person would understand that he wanted to stop fighting that he wanted to stop fighting and did so before killing in self-defense; AND third, he gave his opponent the chance to stop fighting before killing in self-defense. However, if the agreement of mutual combat contemplated only non-deadly force, such as a fist fight, and the opponent responded with such sudden and deadly force that the other could not withdraw from the fight, then the other had the right to defend himself with deadly force and was not required to stop

United States District Court
Northern District of California

United States District Court
Northern District of California

fighting or communicate the desire to stop to the opponent or give the opponent a chance to stop fighting.

Manning argues there was no mutual combat because the shooting was "entirely initiated by Simmons" as it was Simmons who first threatened the defendants in the Heritage Center and, "[l]ater, on the sidewalk, it was Simmons who made good on his earlier threat and did "air it out" at Harrison and Coats, almost killing them and another person in the process" (Mann. Br. at 12). Defendant Coats also argues there was no evidence of Coats' intention to engage in mutual combat because "No witness was called by the government to testify that Mr. Coats intended to shoot Mr. Simmons at any point before Mr. Simmons began to fire into the crowd in Mr. Coats' direction," and "Mr. Coats did not have a gun out before Mr. Simmons started shooting," and "there is no evidence that Coats said anything to suggest that his intention was violence" (Coats Br. at 4).

The jury could easily have found an implied agreement for mutual combat. Construing all inferences in favor of the government, a reasonable jury could have found that all participants implicitly agreed to participate in a gun fight by considering, among other things, Misterdee Simmons' words and conduct as well as defendants' conduct immediately after the threat was made. Sean Harrison testified that Misterdee Simmons was upset in the Heritage Center, pulled out his gun, and stated his exact words were "You bitch-ass niggas better stop playing with me, before I air it out" (RT 264). Harrison also testified "as soon as that happened" Manning reacted by tugging on Harrison's shoulder and exited the Heritage Center "within seconds" (RT 264-5). He and Manning were "running" down the Heritage Center and Manning said "Fuck that, that dude whipped out on me" (*ibid*). Harrison testified that he knew another confrontation was going to happen "because at that point once the gun's pulled out, you're not going to try to talk or hash things out with someone being armed when you're not armed" (RT 267-68).[1]

---

[1] Harrison: "So, um, I felt like once he tugged on my shoulder and pretty much like, you know, told me to follow him, I felt like I was obligated to, you know, back him." Q: "Did you know at that time where you were going?" Harrison: "I had a – a sense." Q: "From where did you get a sense of where you were going?" Harrison: "Once the gun was pulled out and we stormed out." Q: "Okay. And so how did that

He stated when they arrived to the McDonald's parking lot (where their cars were parked), "at that point we could get armed, and now it's even" (RT 268).  The jury then saw on the video the defendants returned, evidently armed, to the Heritage Center where Mr. Simmons was standing outside with his gun drawn, pointed down to the ground.  In this context, it would have been reasonable for a jury to infer that defendants understood they would meet Simmons to "air it out" and that Simmons understood he would do likewise.  This was sufficient to prove an implicit agreement to engage in mutual combat.

Sean Harrison testified that he acted in self-defense and did not have a clear intention of what he was going to do as he walked back up to the Heritage Center after arming himself.  He also said that he did "not exactly" understand the law of self-defense (RT 869). The jury was instructed that they "may believe everything a witness says, part of it, or none of it" (paragraph 8).  Here, the jury weighed all the evidence and reasonably concluded that mutual combat ensued, therefore there could be no right to self-defense.

Defendants argue that Misterdee Simmons' escalated a verbal disagreement, so defendants still retained the right to self-defense.  On these facts, however, a reasonable jury could have found that the mutual understanding between Simmons and the defendants from the get-go was to engage in a shoot-out, evidenced by Simmons taking out his gun, threatening to "air it out," and defendants running immediately to retrieve their own guns.  Because a jury could have reasonably inferred the nature of the conflict was always intended to be a gun-related one, it was entitled to conclude defendants could not avail themselves to the unexpected escalation exception to the mutual combat rule.

---

sequence of events, the gun pulled out and you storming out, how did that give you a sense of where you were going?" Harrison: "Because I know with that happening, that it was going to be a situation."  Q: "What do you mean by 'a situation'?"  Harrison: "Like something was going to happen."  Q: "'Something' – can you be more specific about what 'something' is?" Harrison: "Like, just – just a confrontation, I guess. You know. Try to get an understanding of what just happened." (RT 267-268)

United States District Court
Northern District of California

### 2.     MALICE AFORETHOUGHT.

Defendant Manning argues there was no evidence that he provided Harrison with a firearm with an intent to kill Misterdee Simmons or with an intent to act in conscious disregard for human life (Mann. Br. at 12).  Defendant Manning argues that "the fact that Manning was angry is not evidence that he harbored an intent to kill Simmons." (*ibid*).   But, taken in conjunction with other evidence in the record such as Manning immediately running to his car after Misterdee Simmons' threat, Manning opening his car door, and his quickly returning back to the crowded scene, stating "fuck that, dude whipped out on me," — a jury could reasonably conclude Manning had intent to kill or that he acted in conscious disregard for human life.

Defendant Coats argues there was no direct evidence that he acted to harm Mr. Simmons. (Coats Br. at 6).  However, there was sufficient circumstantial evidence by which the jury could have inferred Coats' intent.  In the light most favorable to the government, the video showed:  Mr. Coats running back to his car after the threat by Misterdee Simmons, moving his car closer to the Heritage Center (and away from the police station) for a quick get-away, retrieving his gun, and returning armed to the crowded scene, right behind his fellow Mac Block member friends.  Coats pushed past SVIP workers who attempted to dissuade him from combat, and the shooting ensued.  On these facts, a jury could have determined by Coats' conduct that he intended to kill or acted in reckless disregard for human life when he returned armed to Misterdee Simmons.  Although counsel argues that Coats did not exhibit a demeanor indicative of harmful intent, and that the video depicted defendant Coats walking backwards from — instead of being pushed back by — the SVIP workers, these interpretations of the video were up to the jury to decide in light of the entire scenario.

### 3.     ENTERPRISE PURPOSE.

Both defendants argue that the government offered no proper evidence of the necessary VICAR purpose.  The statute reads in relevant part as follows:

> Whoever … for the purpose of gaining entrance to, or maintaining or increasing position in an enterprise engaged in racketeering activity murders … any individual in violation of the

6

1  laws of any State or the United States or conspires so to do shall be
2  punished…

3  (18 U.S.C. §1959).  Paragraph 48 instructed the jury that under this federal VICAR statute "not

4  only does the prosecution have to prove malice aforethought, but it must also prove the murder

5  was 'for the purpose of gaining entrance to or maintaining or increasing position in an

6  enterprise engaged in racketeering activity.'"  We explained "[t]he law does not require the

7  government to prove that the only purpose was to gain entrance to or maintain or increase

8  position in an enterprise engaged in racketeering activity.  But, if such a purpose was not the

9  only purpose, it must have been at least a substantial purpose for the murder."  Paragraph 50

10  warned that "mere status as a member of an enterprise is not enough to prove the required

11  purpose."

### A.  Robert Manning VICAR purpose.

13  Defendant Manning was charged on an aiding and abetting theory, so the government

14  had to prove, as was instructed to the jury, two states of mind regarding purpose (paragraph

15  56):

16  One, it must prove beyond a reasonable doubt that Sean
    Harrison committed murder for the purpose of gaining entrance to or
17  maintaining or increasing position in an enterprise engaged in
    racketeering activity.  Two, the prosecution must prove beyond a
18  reasonable doubt that Robert Manning knew of that purpose and acted
    with the intent to facilitate a  VICAR murder.

20  At the hearing, defendant Manning argued there was no evidence to support an inference

21  that Sean Harrison acted with VICAR purpose, because Sean Harrison wasn't a gang member

22  and therefore could not possibly have acted to maintain or increase his status in a gang of

23  which he was never apart.  Further, counsel argued, even if Sean Harrison wanted to "back" his

24  cousin defendant Manning when he decided to take the other semi-automatic firearm from the

25  car floormat, this desire to support family does not equate to a gang purpose.  Both arguments

26  fail.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

For one, counsel misconstrues the standard for VICAR purpose.  During the hearing, counsel repeatedly stated the gang-related purpose must be to gain entrance into, maintain or increase *status* in an enterprise.  However, the statute states one must have the purpose "of gaining entrance to or maintaining or increasing *position* in an enterprise. . ."  As our court of appeals reasoned in *Rodriguez*, the word "position" is "a broad term that encompasses the ringleader of an Eme faction as well as the less formal role of [a] secretary." *United States v. Rodriguez,* 971 F. 3d 1005, 1011 (9th Cir. 2020).  The court also cited a second circuit decision which rejected defendant's argument that his VICAR conviction should be reversed because he was a "mere associate" rather than a "made member" of a crime family. *Ibid.*   Finally, on this point, the court further noted the indictment broadly encompassed "leadership, membership, and associates." *Ibid.*

So too here.  Even accepting defendant Manning's argument that Sean Harrison was not a "made member" of Mac Block, it was reasonable to conclude that he was associated with the Mac Block gang.   Sean Harrison was not living in San Francisco, but he was raised in the Fillmore, had long-time friends there, and identified with Mac Block even though he was not a member.  He testified he had family members in Mac Block and that for those involved, he didn't think of family and Mac Block as distinct concepts, "they overlap[ped]." (RT 861).  Defendant Manning, who was Harrison's first cousin whom he has known all his life, was a member of the Mac Block gang, and the jury saw numerous photos showing Manning's affiliation by way of tattoos and hand gestures.  Harrison knew who was "in the beef" and who was not, and could identify Mac Block territory because he regularly hung out there when he would come back into town.  In the light most favorable to the government, the jury could have concluded that Harrison was an associate, and his standing and "position" with Mac Block was important to him.  The jury heard Harrison testify "I felt obligated to, you know, back [Manning]" (RT 267).  When asked why he grabbed the all-black Glock 23, he responded "Like I said, I felt obligated, slightly intimidated, to back him . . . just support him, whatever

8

[sic] he was doing" (RT 273). A reasonable jury could have concluded when his gang-involved family member and close friend wanted to engage in violence in Mac Block territory, he chose to stand shoulder to shoulder with the gang and to stand up for the gang too, thereby maintaining his position with the gang.

Contrary to counsel, "backing" his cousin Manning versus backing the enterprise also does not change matters. *Rodriguez* considered the fact that the defendant, Susan Rodriguez, argued she only acted "out of a desire to protect herself and her family" stating this was "not inconsistent with a VICAR membership purpose." *Id.* at 1012. *Rodriguez* reasoned "this VICAR element focuses not on the defendant's purpose for gang affiliation, but rather whether that gang affiliation motivated the relevant conduct." *Ibid.* On this record, a jury could have found Sean Harrison armed himself with defendant Manning and committed murder to "back" the Mac Block gang comprised of his family and close friends. Manning displayed knowledge of this purpose by allowing Harrison access to arm himself with the Glock 23 in his car, and walking along side Harrison to return to the scene.

### B. Jamare Coats VICAR purpose.

Defendant Coats was charged as a principal actor, *i.e.*, a shooter, therefore we must analyze what evidence existed showing his personal VICAR purpose. Defendant argues there was not enough evidence to prove he acted with the required gang-related purpose. However, much like the analysis for mutual combat intention, the purpose can be inferred through the context of the situation and defendant Coats' conduct. The jury heard that the Heritage Center was located within or near Mac Block territory and defendants, who were Mac Block members, were present at the repast on March 23, 2019. When Misterdee Simmons began throwing insults and brandished his firearm at another Mac Block member, Harrison testified Simmons' words were directed "to the whole group" because "he said 'bitch-ass niggas,' with an s," making "it plural not singular" (RT 266). Harrison described these words as insulting (RT 261). Coats' conduct after this exchange was, as described above, to leave the repast,

move his car closer, arm himself, and return to the crowded scene following close behind his fellow gang member Manning and associate Harrison.  He then evaded SVIP workers who were attempting to push him back to get closer to Simmons, who had just hurled the insult and was clearly armed.  This circumstantial evidence all points to a reasonable inference that defendant Coats was insulted by Simmons' conduct in Mac Block territory threatening his gang.  His actions point to a swift, coordinated reaction with other gang members and associates, although there was no evidence of words or instructions being exchanged.  A jury was within its province to deduce from all the evidence and context that defendant Coats was acting to maintain his position in Mac Block by defending it against the words and conduct of an armed and angry Simmons.

### 4.   ENTERPRISE PURPOSE VS. RACKETEERING CONDUCT.

More than once in the trial and the final pretrial conference, counsel and the Court considered the extent to which racketeering evidence should be admitted to prove up the racketeering acts required by the statute.  The statute requires that the government prove an enterprise "engaged in racketeering activity."  The government proposed and the Court eventually allowed several racketeering acts, some of which involved defendants, some of which did not (but involved other Mac Block members), and some of which were recent and some which were not.  In doing this, the Court undertook a Rule 403 analysis and measured the probative value of the evidence (considering the need of the government to prove its case) versus prejudice to defendants from exposure to the jury to these prior uncharged bad acts.  At one point, the Court itself suggested a bifurcation whereby the jury would first determine whether or not a murder had occurred, and, if it so found, would then hear further evidence concerning racketeering acts and the enterprise and determine whether the murder was done for "the purpose of gaining entry to, maintaining or increasing position in" an enterprise.  The defendant had not proposed such a bifurcation.  Once the Court raised the issue, defendants made such a motion, which was heard on the first day of trial.  After further consideration, the

10

Court denied bifurcation and opted to deal with the potential prejudice from the prior uncharged bad acts through a cautionary instruction to the jury, which instruction was repeatedly given during the part of the trial the prior bad acts were presented. The cautionary instruction was also given to the jury in the instructions which stated (paragraph 12):

> You have heard evidence regarding acts that took place before 2019. As I instructed you, you may consider this evidence only for the limited purpose of determining whether or not the government has proven the alleged racketeering enterprise, its general function, and the defendant's association with it. Therefore, you must consider it only for that limited purpose and not for any other purpose. You may not consider those acts with respect to the homicide of Misterdee Simmons on March 23, 2019, including issues of intent and purpose. A further limitation on this evidence is that the recordings of police interviews of defendant Jamare Coats are admitted only against Jamare Coats, not against Robert Manning.

The statute itself creates an inescapable dilemma because it requires proof of racketeering acts separate and apart from the murder, and the racketeering acts by definition will be prejudicial to defendants. Our circuit, however, discouraged bifurcation of elements in a single criminal charge. In *United States v. Barker,* our court of appeals reversed a trial court's bifurcation of a felon in possession charge, reasoning bifurcating would lead to an "impermissible result" because "the government would be precluded from proving an essential element of the charged offense, and the district court would breach its duty to instruct the jury on all essential elements of the crime charged." 1 F. 3d 957, 959 (9th Cir. 1993). In the Court's judgment, in the circumstances in this case, the cautionary instructions repeatedly given was the best solution. In this regard, all of the racketeering acts were presented back-to-back well after all the evidence concerning the murder, so it would have been easier for the jury to compartmentalize and to heed the cautionary instruction.

Against this important backdrop, we consider the problem of Johnny Brown. Johnny Brown was a cooperating witness from a different case who testified to the existence of Mac Block and its territory, his interactions with Mac Block members as a member of CDP (a gang

what was allegedly "cliqued up" with Mac Block), and the general inner workings of Mac Block given the similarities between it and his own gang.  This testimony was all subject to the same cautionary instruction.  The Court found Johnny Brown to be so vague and evasive in his answers that the Court prohibited the government from eliciting more testimony from him that would have directly implicated Robert Manning in prior racketeering activity.  Given the cautionary instruction, the jury was instructed not to consider Johnny Brown's testimony with respect to the purpose of the murder.  The Court is persuaded that the jury followed this instruction.  (The jury was permitted, of course, to consider the circumstantial evidence summarized above that have nothing to do with prior racketeering acts in determining the purpose of the murder.)

## CONCLUSION

All other points named in the acquittal motions are adequately addressed by the government's opposition brief, which is hereby incorporated into this order.  For the reasons described herein, the defendants' motions for acquittal are **DENIED**.


**IT IS SO ORDERED.**


Dated: September 14, 2022.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE