UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

ROBERT MANNING and JAMARE COATS,

    Defendants.

No. CR 19-00313 WHA

**ORDER DENYING MOTIONS FOR A NEW TRIAL**

## INTRODUCTION

After a jury convicted them of murder in aid of racketeering and possession of a firearm, defendants Robert Manning and Jamare Coats move for a new trial pursuant to FRCrP 33 (Dkt. No. 707, 709). For the following reasons, the motions are **DENIED**.

## STATEMENT

Defendants Jamare Coats and Robert Manning were each charged with one count of murder in aid of racketeering (VICAR murder) in violation of 18 USC 1959(a)(1) and one count of possession of a firearm by a prohibited person in violation of 18 USC 922(g). After a two-week jury trial, both defendants were found guilty of both counts. On September 14, defendants' Rule 29 motions for judgments of acquittal were denied (Dkt. No. 717). Both defendants now move for a new trial.[1]

---

[1] The background facts were already provided in the order on motions for acquittal (Dkt. No. 717)

**ANALYSIS**

Federal Rule of Criminal Procedure 33(a) states "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The decision to grant a new trial lies within the trial judge's discretion and is reviewed for abuse of discretion. *United States v. Rush*, 749 F.2d 1369, 1371 (9th Cir. 1984). For such motions, the trial judge weighs the evidence and evaluates the credibility of the witnesses — the evidence need not be viewed in the light most favorable to the verdict. *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000). A motion for a new trial, however, should only be granted in "exceptional" circumstances where the "evidence preponderates sufficiently heavily against the verdict such that a serious miscarriage of justice may have occurred . . ." *United States v. Alston*, 974 F.2d 1206, 1211–12 (9th Cir. 1992) (citations omitted); *United States v. Hsieh Hui Mei Chen*, 754 F.2d 817, 821 (9th Cir. 1985).

1. **MUTUAL COMBAT.**

Both defendants argue, as they did in their respective motions for acquittal, that there was no evidence of mutual combat in this case. Coats argues there "is simply no evidence in the record of a preexisting agreement between Coats and Simmons to engage in a gunfight." Because Simmons was the instigator, Coats maintains, "there was nothing mutual about the combat" (Br. at 5, 15). Similarly, Manning argues "[t]he facts of the case did not imply an agreement to engage in a gunfight" as "the instigator at all times was Simmons" (Br. 9, 10). This argument was offered and rejected by the jury. So too here. Even without construing all facts in favor of the verdict, this order finds there was ample evidence of mutual combat when the scenario is analyzed in its contextual entirety. After Simmons threatened to "air it out" if the defendants didn't stop playing with him, defendant Manning immediately ran out of the Heritage Center with Harrison alongside. As they were running, Manning stated "Fuck that, dude whipped out on me!" and, when he arrived to his vehicle, he opened the car door and flipped up the floor mat to reveal two guns. Without exchanging words, Manning and Harrison each took

---

and will thus not be repeated here.

one gun and headed back to the Heritage Center where Simmons waited. Simultaneously, Coats went to his vehicle, moved it closer to the Heritage Center, armed himself, and returned to the scene shortly behind his gang-affiliated comrades. Although defendants emphasize the fact that Simmons shot first, this factor alone does not preclude a finding of mutual combat. The question is not who started the conflict, but rather whether the participants understood and impliedly agreed to participate in the shootout prior to shots being fired. By virtue of all the defendants leaving, getting armed, and returning to the scene where Simmons remained waiting, in the context of the situation that had unfolded only moments before, there was sufficient evidence presented at trial to find that an implied agreement existed.

### 2. ENTERPRISE PURPOSE AND JOHNNY BROWN'S TESTIMONY.

Both defendants argue the evidence does not support the verdict because no permissible evidence spoke to defendants' enterprise purpose on the day of the murder. Namely, defendants argue Johnny Brown's testimony should have been stricken in its entirety, as it was incorrectly used by the government and jury to bridge the gap on the enterprise purpose element. Without the impermissible use of Brown's testimony, defendants maintain, there was no other evidence of enterprise purpose as to the two defendants and a new trial should be granted due to this apparent miscarriage of justice.

Section 1959 of Title 18 of the United States Code states in relevant part:

> Whoever. . . *for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity* murders . . . any individual in violation of the laws of any State or the United States or attempts or conspires so to do shall be punished. . .

(emphasis added). The statute specifies that the murder must be for the purpose of gaining entrance to or maintaining or increasing position in the enterprise. But facts can be proven by direct or by circumstantial evidence. The circumstances proven in the case allowed the reasonable inference that the murder was for the purpose of maintaining status with the gang and that those involved expected each other to stand up to Simmons' provocation — as they did. Not doing so would have jeopardized their standing within the gang or so the jury could reasonably have found.

It is true that Harrison said he shot in self-defense. Self-defense, however, would be fully

3

consistent with a further purpose to stand up against Simmons and his threat. Simmons, yes, shot first, but that does not erase the fact that defendants converged with guns to confront him.

Relatedly, defendants argue that the prosecutors made an improper closing argument. Defendants say that the prosecutors used evidence admitted for a limited purpose to suggest a more general point, namely to show that the murder was committed for a VICAR purpose. Specifically, defendants accuse the prosecution of using testimony by Johnny Brown concerning the code of respect (and disrespect), admitted solely to prove up a different point — *i.e.*, the enterprise and its functioning — to instead prove why Coats and Harrison murdered Simmons.

It is true that code of respect testimony came from Johnny Brown, an ex-member in an allied gang. Brown's testimony was restricted to the issue of enterprise, including the functioning of the enterprise, and the jury was repeatedly reminded, as in paragraph 12 of the final charge:

> [Y]ou may consider this evidence only for the limited purpose of determining whether or not the government has proven the alleged racketeering enterprise, its general function, and the defendants' association with it. Therefore, you must consider it only for that limited purpose and not for any other purpose. You may not consider those acts with respect to the homicide of Misterdee Simmons on March 23, 2019, including issues of intent and purpose. . .

(Dkt. No. 685). Johnny Brown testified the following regarding the code of respect and disrespect in gangs (Tr. 2155–56):

> Question: While you were an active member of CDP — so, from, say 15 years old or so to about 21 — were there other ways that you, as a gang member, might earn disrespect? Might lose reputation?
>
> Brown: If we have a gun and we don't shoot the gun at a rival gang member if we run into him; if we allow somebody to disrespect our gang members that died, that was murdered; if we allow someone to jump us, rob us, or also point firearms at us.
>
> Question: All right. If somebody pointed a firearm at you, you personally . . . what were you expected to do?
>
> Brown: I – I was expected to either shoot at them, try to kill them, or retaliate, if I knew who they was.
>
> Question: Are you familiar with the term, "whipping out"?
>
> Brown: Yes.
>
> Question: What does that mean?
>
> Brown: Pulling out a gun.

4

> Question: If you whipped out on somebody — you personally — during the period when you were active in CDP, would you be disrespecting them?
>
> [. . .]
>
> Brown: Yes
>
> Question: If they didn't do something about it, is that some — would that allow you to taunt them?
>
> Brown: Yes.
>
> [. . .]
>
> Question: All right. So respect and disrespect are – were, for you, when you were an active CDP member, part of the gang life?
>
> Brown: Yes.

Here is what the prosecution argued in closing argument:

> Would it be important, based on what you know of the evidence — and I'm focusing now on March 23 — to know that this is a shooting that happens in front of a bunch of people at the Fillmore Heritage Center, not that far — we're not saying its Mac Block territory, it's not Prince Hall Apartments. It's not that far away. . . Who is around? Will the word get around about what you do or what you don't do? What you don't do. If somebody disrespects you by threatening to air it out, and pulls a gun on you, does that matter? Well, Sean Harrison said he saw it as disrespect. And that's an important admission (Tr. 2554 – 55).
>
> Harrison, as of this time, as of this moment when he grabs the gun and gets out of the car — he's been in Mac Block long enough to understand the role of violence, the role of disrespect . . . He demonstrated that he understood that dynamic by taking a gun to back his cousin, his fellow gang member, Robert Manning (Tr. 2567).
>
> A group of four inside the Heritage Center suffered disrespect. Deep disrespect. Somebody said words that shouldn't be said. And threatened them with a gun. In their world, deep disrespect. Hot words, even worse action. And he threatened to use the gun if they didn't stop playing. Well, what did they do? They ran [and] got guns. Harrison got a gun to back his cousin, his fellow Mac Block member. Steps forward. There's a way to increase, increase position. He had not been in the life; he was going into that life now (Tr. 2572).

Was this a misuse of the Johnny Brown testimony? It did not refer to the Brown testimony. Harrison himself, moreover, also testified the following regarding respect, and all of his testimony was usable without limit (Tr. 261, 863–64):

>Question: Okay. So, during this argument, the words that were being said to this point, up to the point you've described so far, in your experience, how — how insulting are these things to say to someone else?
>
>Harrison: Very.
>
>Question: How disrespectful are these sorts of words that Mr. Armstrong and Mr. Simmons were exchanging?
>
>Harrison: Very disrespectful.
>
>Question: In your experience, does an exchange of words like that ever escalate?
>
>Harrison: Yes, it can.
>
>[. . .]
>
>Question: Inside the Heritage Center, at the time Misterdee Simmons pulled out the gun, did you find his words threatening?
>
>Harrison: Yes.
>
>Question: Did you find his words disrespectful?
>
>Harrison: Yes.
>
>Question: Did you find his action of pulling out the gun threatening?
>
>Harrison: Yes.
>
>Question: Did you find his action of pulling out the gun disrespectful?
>
>Harrison: Yes.
>
>Question: To whom did Misterdee direct that threat and disrespect?
>
>Harrison: Myself, Mr. Manning, Mr. Coats, and Mr. Armstrong.

To repeat, the government's argument actually made no reference to Johnny Brown. Although it is possible that the argument could be construed as an invitation to rely on the Johnny Brown testimony for an improper purpose, the repeated admonitions to the jury to limit use of the Johnny Brown testimony and racketeering evidence were clear and emphasized (Tr. 1467-68, 1499-1503, 1719, 1813, 1862-63, 1905, 2367, 2517).

Moreover, the government's actual argument breaks down as follows:

i. Harrison felt that Simmons' words (spoken to Mac Block members) were very disrespectful, as was Simmons' pulling out a gun.[2]

ii. Harrison felt obliged to vindicate those who had been disrespected and those disrespected had been gang members.

iii. This aligned with an enterprise purpose because gangs vindicate gang members who get disrespected, according to Johnny Brown.

The Johnny Brown testimony should not have been used other than to explain how gangs functioned including the role of respect and disrespect. But defendants are incorrect in saying that the prosecutor used it for anything more than that purpose. Harrison himself testified that Simmons' words and actions were "very disrespectful" (Tr. 261, 863-64). These were directed at Mac Block members in his presence. The jury could have permissibly found that Harrison found Simmons' words and actions to be "very disrespectful" and that Harrison felt "obligated" to vindicate his Mac Block associates and to stand shoulder to shoulder with them. In turn, that purpose could reasonably have been found by the jury to align with maintaining his position and status with the gang. Johnny Brown's testimony could have been used to show that Harrison's purpose aligned with the general functioning of gangs.

The same points hold true in parallel for Coats.

In sum, the evidence was strong that at the Heritage Center, Simmons got into an argument with Mac Block members, showed his gun, and offered to "air it out" if they didn't stop "playing with" him — an invitation that the Mac Block immediately accepted, including Harrison, by rushing to their cars to retrieve loaded firearms and rushing back to the Heritage Center to confront Simmons together. The jury could have reasonably concluded that all of them acted for the purpose of standing up for each other and against the threat posed by Simmons. This was enough to prove a VICAR gang purpose.

### 3. MIXED MOTIVES.

Both defendants also argue against the idea that Coats and Manning had "mixed motives," thereby negating their right to self-defense. Manning argues "[g]iven testimony that [Harrison]

---

[2] Because Manning was convicted on a theory of aiding and abetting Harrison's VICAR murder, it is Harrison's purpose that is relevant for this portion of the analysis.

acted only in self-defense and fear for his own life, it is not reasonable to conclude that Harrison was motivated by a combination of fear and a desire to harm Simmons" (Br. 11). This argument misstates the record. Harrison did not feel like he was acting in self-defense when he went to the car to get the guns and when he came back up Fillmore Street to the Heritage Center (Tr. 871). Harrison also grabbed the all-black Glock 23 because he felt obligated to back Manning (Tr. 273). From this testimony, a jury could have reasonably concluded Harrison didn't return to the Heritage Center for concern for his family or for self-defense alone.

Coats argues there is nothing to suggest in his demeanor before leaving the Heritage Center, nor in his pattern of shots fired that he was acting with any intent other than self-defense. Defendant argued this point during trial and the jury disagreed. The Court sees no occasion to put aside that finding now, with ample support in the record. Coats ignores the actions that *did* evidence other intent, such as his moving his car away from the police station and closer to the Heritage Center, getting armed, returning to the Heritage Center, and pushing past SVIP workers to get closer to Simmons, who had just threatened to shoot him and his friends. This was depicted on video, and although defendant can argue his version of what the video shows, a jury was free to disregard that interpretation for another reasonable one. Both defendants could have been found to have acted on other motivations apart from self-defense alone. This order declines to set aside the verdict as the evidence does not weigh sufficiently heavily against the verdict as defendants attempt to portray.

## CONCLUSION

For the forgoing reasons, the motions for new trial are **DENIED**. Both sides vigorously argued their positions during trial and a valid verdict was rendered. There is no occasion to disturb the jury's decision.

**IT IS SO ORDERED.**

Dated: November 9, 2022.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

8